The Potomac Edison Company, Appellant *v.* Commonwealth of Pennsylvania, Appellee.

Argued November 14, 1979, before President Judge BOWMAN and Judges CRUMLISH, JR., MENCER, ROGERS and CRAIG. Judges WILKINSON, JR., BLATT, DISALLE and MACPHAIL, did not participate.

*Howell C. Mette,* with him *Lloyd R. Persun,* of *Shearer, Mette & Woodside,* for appellant.

*John H. Whitmoyer,* Deputy Attorney General, with him *Eugene J. Anastasio* and *Vincent Yakowicz,* Deputy Attorneys General, for appellee.

OPINION BY JUDGE CRAIG, March 10, 1980:

The Potomac Edison Company (taxpayer) appeals from the order of the Board of Finance and Revenue sustaining the Department of Revenue's settlement of its 1972 franchise tax, in the amount of $65,363.10 with interest. The Department of the Auditor General approved the settlement, and taxpayer filed a petition for resettlement with the Department of Revenue and the Department of the Auditor General, which was refused. Taxpayer appeals.

Taxpayer is a Maryland corporation operating as a public utility, with a certificate of public convenience from the Pennsylvania Public Utility Commission. Taxpayer is a tenant-in-common, with West Penn Power Company and Monongahela Power Company, of a site known as Hatfield's Ferry Power Station (station), where those tenants operate a steam-driven electric power plant as a joint venture. Taxpayer owns an undivided 20% interest in the power plant and the underlying real property. From

its share of the output of the station, taxpayer furnishes electric service only to customers in Maryland.

Section 602(b) of the Tax Reform Code of 1971, Act of March 4, 1971, P.L. 6, *as amended*, 72 P.S. §7602(b), imposes a franchise tax on every foreign corporation, joint-stock association and limited partnership, but provides:

> That the manufacturing, processing, research and development exemptions as contained under section 602(a) [imposing a tax on the capital stock of domestic corporations] shall also apply to foreign corporations. . . .[1]

Section 602(a), 72 P.S. §7602(a) states that:

> Provided, That the provisions of this section shall not apply to the taxation of the capital stock of corporations, . . . organized for manufacturing, processing, research or development purposes. . . .

Section 4 of the Act of July 1, 1978, P.L. 594, eliminated the manufacturing exemption as to those companies that "enjoy and exercise the right of eminent domain." The intent of the General Assembly, as stated in Section 3 of that act, was that this ineligibility for the manufacturing exemption be retroactive to August 31, 1971, or the "furthest legal date possible," if the retroactive effect to the stated date was determined to be unlawful.

---

[1] The Act of March 4, 1971, P.L. 6 eliminated the manufacturing exemption for capital stock and franchise tax purposes, retroactive to January 1, 1971. By the Act of August 31, 1971, P.L. 362, the General Assembly again adopted a "manufacturing, processing, research and development" exemption, effective June 30, 1971. The disqualification for those otherwise exempt manufacturing, processing or research companies who "enjoy or exercise" the right of eminent domain did not appear in the tax legislation until by Act of July 1, 1978, P.L. 594, the eminent domain disqualification was reenacted.

Taxpayer contends that the production of electrical energy constitutes "manufacturing" for the purposes of Section 602(b), and that it is entitled to the exemption for the calendar year 1972.

The Commonwealth submits that taxpayer is not involved in "manufacturing" as that term has been defined by the case law, and alternatively contends that the intent of the legislature was not to include electric generating companies in the class of companies otherwise entitled to manufacturing exemptions.[2]

The applicability of the manufacturing exemption of the Tax Reform Code of 1971 to a corporation engaged in the production of electricity has not previously been directly before this court. Taxpayer relies upon precedents which this court, in *Golden Triangle Broadcasting, Inc. v. City of Pittsburgh,* 31 Pa. Commonwealth Ct. 547, 558, 377 A.2d 839, 845 (1977), characterized as "somewhat old and vague authority for the proposition . . . that the production of electricity, which could be considered an intangible, is 'manufacturing'." Specifically taxpayer relies on *Southern Electric Light and Power Co. v. Philadelphia,* 191 Pa. 170, 43 A. 123 (1899), and *Commonwealth v. Northern Electric Light and Power Co.,* 145 Pa. 105, 22 A. 839 (1891).

In *Northern Electric, supra,* the Supreme Court had to determine whether a company which produces electricity was a manufacturing company within the meaning of the Act of June 30, 1885, P.L. 193, which

---

[2] The Commonwealth also submits that if this court determines that taxpayer is involved in manufacturing, taxpayer would nonetheless be disqualified from the exemption under Section 2 of the Act of July 1, 1978, P.L. 594, amending Section 7602(a) and (b) of the Tax Reform Code of 1971, because it is a company that enjoys and exercises the right of eminent domain, as noted above.

placed a tax on the capital stock of domestic corporations while exempting manufacturing companies from such taxation. The controlling question in the case was the sense in which the term "manufacturing companies" was used under the statute. The court specifically stated that it would not decide the question of whether the production of electricity was manufacturing, although the lower court had determined that it was not. The court held that Northern Electric was not entitled to exemption from the capital stock tax and based its holding on the definition of "manufacturing companies" as found in the general incorporation act, Act of April 29, 1874, P.L. 73, which provided for classes of manufacturing corporations, none of which included corporations engaged in providing a service of a quasi-public nature. The Supreme Court said:

> Such companies have never been included in any of the legislation provided for the encouragement and protection of manufacturing corporations, and have no right to share in the benefits of such legislation. They really form a class by themselves.

*Northern Electric and Power Co., supra,* 145 Pa. at 120, 22 A. at 841.

Although the court also stated that, "if this case depended on the question on which it turned in the court below, we should be led by the findings of fact to a different conclusion of law from that which was there reached, and hold that this company was a manufacturing company" 145 Pa. at 118, 22 A. at 840, that statement as to the meaning of manufacturing as a function was dictum because the court's actual holding was limited to the definition of "manufacturing companies."

In *Southern Electric Light and Power Co., supra,* the Supreme Court held that, although land parcels

were held in reserve for future use, they were nevertheless part of the premises exempt from local real estate tax. The brief per curiam opinion disclaims any distinction between the "manufacturing" of electricity and the "supplying" of it. The court was emphasizing the unity of the generating and distribution aspects, and whether Southern Electric's business actually constituted "manufacturing" was not before the court.

Thus, we do not believe that the above-cited cases have conclusively determined whether, for purposes of the Tax Reform Code of 1971, electric power companies are entitled to the manufacturing exemption.

We now hold, after a careful review of the applicable law, the parties' stipulations and the testimony at the evidentiary hearing, that an electric company is not entitled to the manufacturing exemption because the production of electricity is not manufacturing.

In considering whether the activities involved in the production and distribution of electricity constitute "manufacturing", the difficulty is the absence of a statutory definition of that term for the present context.[3] "Whether a particular activity is 'manufacturing' as that term has been defined by *case law only* is purely an issue of law under the facts of a particular case." *Golden Triangle Broadcasting, Inc., supra,* 31 Pa. Commonwealth Ct. at 551-52, 377 A.2d at 842. (Emphasis in original.)

Of course, a modern generating plant is a technologically complex and sophisticated operation requiring expertise, labor and great expense.

At the evidentiary hearing, Dr. Howard Hamilton, a professor of electric power engineering at the Uni-

---

[3] Section 602(c), 72 P.S. §7602(c), defines 14 operations that constitute "processing" for purposes of the processing exemption in Section 602(b).

versity of Pittsburgh, testified extensively for the taxpayer on the production of electricity. He stated his opinion that useful electrical energy is a man-made product. He outlined the process by stating:

A. [W]e are taking raw materials, coal, oxygen, in the form of air, water, and performing a series of processes with these ingredients, and the ultimate output is electrical energy or electricity as you mentioned.

Q. Describe this process.

A. Well, coal itself has an inherent energy. . . . The energy that is in this, or in the fuel here, in the coal, is energy in chemical form, and first in the process of producing electricity *the energy and the fuel is converted to heat,* and *the heat energy so produced is then carried along by water or steam,* in other words, we heat the water, the water is changed to vapor form, and *this acts as a carrier for the heat energy; the heat energy and the vapor or steam enters the steam turbine,* the *steam turbine converts the heat energy into mechanical energy,* the *shaft of the steam turbine then transmits the mechanical energy into the generator,* and the *generator's purpose is to convert the mechanical energy into electrical energy,* thus we have the complete cycle.

There are a lot of other activities associated with these multiple conversion processes that I haven't mentioned, for example, when you are circulating water, we are chemically treating the water to maintain purity, a great many aspects of the whole operation that are peripheral to but necessary in this energy conversion process.

*Essentially we are starting with chemical energy and going through the processes and final-*

*ly coming out with electrical energy.* (Emphasis supplied.)

Reviewing the judicial interpretation of the term "manufacturing" in *Commonwealth v. Deitch Co.*, 449 Pa. 88, 93, 295 A.2d 834, 837 (1972), our Supreme Court quoted with approval from *Commonwealth v. Berlo Vending Co.*, 415 Pa. 101, 104, 202 A.2d 94, 96 (1964):

'The meaning of "manufacturing" has been restated by this Court in Philadelphia School District v. Parent Metal Products, Inc., 402 Pa. 361, 364, 167 A.2d 257, 258-59 (1961); " 'Manufacturing' as used in a legislative enactment is given its ordinary and general meaning. It consists in the application of labor or skill to material whereby the original article is changed into a new, different and useful article: Commonwealth v. Weiland Packing Company, 292 Pa. 447, 449, 141 Atl. 148 (1928); Pittsburgh v. Electric Welding Company, 394 Pa. 60, 145 A.2d 528 (1958)....

'On the same day as the decision in Parent Metal Products Co., we also decided Philadelphia School District v. Rosenberg, 402 Pa. 365, 368, 167 A.2d 259-260 (1961), in which we emphasized that "it is the popular or practical understanding of what is 'manufacturing' that prevails and is intended." '

Concededly, 'it is sometimes difficult to determine with legal exactness what is and what is not manufacturing', Commonwealth v. McGrady-Rodgers Co., 316 Pa. 155, 158, 174 A. 395 (1934), for as one court has observed, '[i]t is easier to feel the line of distinction than to express it. . . .' Philadelphia School District v. Mutual Trimming Co., 14 Pa. D. & C. 2d 207, 209 (1957).

Thus, the touchstone of the legal concept of the term "manufacturing" is the application of skill and labor to original "material" whereby it is substantially changed into a new, different and useful "article". The traditional legal concept assumes tangible "material" as a starting point, and a continuity of existence of that material into the final product.

We therefore find crucial to our determination the fact, as the parties' stipulation and the testimony of taxpayer's expert witness point out, that the original material here, coal, is not material which survives in the new "product"; coal is simply the chemical energy source from which the entire process of electric generation begins, and in the process it is consumed and discarded. The harnessing of heat energy from the coal fuel, its conversion into mechanical energy in the turbine and the final conversion to electrical energy in the form of an electric current, is hence not "manufacturing" in the ordinary understanding of that term. Where no molecules of the original raw material survive in the final product, we thus do not have manufacturing in the judicial sense of "application of labor or skill" to "material."

We recognize that, in this electronic age, it may be scientifically myopic to recognize only continuity of tangible material and to ignore the equally real— although less tangible—continuity of elemental energy. However, we are construing legislation and therefore believe that the legislature intended to use the ordinary (and perhaps more easily applied) concept of tangible material. Until the legislature expressly indicates an intent to embrace more scientific concepts, we must assume adherence to "the popular and practical understanding," as the Supreme Court said in *Deitch, supra* and *Berlo Vending, supra*.

Having determined that taxpayer is not entitled to the manufacturing exemption of the franchise tax,

we need not consider the eminent domain disqualification issue, but may proceed to enter judgment in favor of the Commonwealth and against taxpayer in the amounts stipulated to by the parties in their Stipulation of Facts I (dated May 4, 1979): $97,755.00 of which $65,363.10 has been paid by taxpayer. The remainder shall be paid with interest, as provided by law.

### Order

And Now, this 10th day of March, 1980, unless exceptions are filed within thirty days of the date hereof, the Order of the Board of Finance and Revenue is affirmed. Judgment is entered in favor of the Commonwealth of Pennsylvania, and against Potomac Edison Co., with interest, in the amount stipulated by the parties in their Stipulation of Facts I, dated May 4, 1979 ($97,755.00 of which $65,363.10 has already been paid).

President Judge Bowman did not participate in the decision in this case.

Judge DiSalle did not participate in the decision in this case.