570 A.2d 601

SUBURBAN CABLE TV CO., INC., Petitioner,

v.

COMMONWEALTH of Pennsylvania, Respondent. (Three Cases)

LEBANON VALLEY CABLE TV CO., INC., Petitioner,

v.

COMMONWEALTH of Pennsylvania, Respondent. (Three Cases)

WARNER CABLE CORP. of PITTSBURGH, Petitioner,

v.

COMMONWEALTH of Pennsylvania, Respondent. (Three Cases)

WARNER AMEX CABLE COMMUNICATIONS, INC., Petitioner,

v.

COMMONWEALTH of Pennsylvania, Respondent.

Commonwealth Court of Pennsylvania.

Argued Sept. 13, 1989.

Decided Feb. 14, 1990.

Arthur R. Littleton, with him, Dennis R. Bartholomew and Peter Konolige, Hoyle, Morris & Kerr, and Robert H. Louis, Fox, Rothschild, O'Brien & Frankel, for petitioners, Suburban Cable TV Co., Inc. and Lebanon Valley Cable TV Co.

Marvin A. Fein, with him, Philip Baskin, Dusty Elias Kirk and William J. Moorhead, Jr., Baskin, Flaherty, Elliott & Mannino, P.C., for petitioners, Warner Cable Corp. of Pittsburgh and Warner Amex Cable Communications, Inc.

Robert P. Coyne, with him, Matthew W. Tomalis, Deputy Attys. Gen., and Ernest D. Preate, Jr., Atty. Gen., for respondent.

Before CRUMLISH, Jr., President Judge, and CRAIG, DOYLE, BARRY, COLINS, McGINLEY and SMITH, JJ.

CRAIG, Judge.

## SUMMARY INTRODUCTION

These appeals, consolidated from proceedings at ten different docket numbers of this court, are from adjudications of the Board of Finance and Revenue, some in capital stock tax cases and others in sales and use tax cases. The taxpayers in the case at 2757 C.D.1988 and the five 1979 docket numbers in the 1600's are Suburban Cable TV Co., Inc. (Suburban) and Lebanon Valley Cable TV Company (Lebanon), who seek exemption from capital stock tax only. ("Suburban/Lebanon" will be the term used when referring to the entire group of six cases.)

The taxpayers in the remaining four cases, with 1984 and 1985 docket numbers, are Warner Cable Corp. of Pittsburgh and Warner Amex Cable Communications, Inc. (Warner). In these appeals, Warner seeks exemption from sales and use tax as well as from capital stock tax, and No. 1510

C.D.1985 involves an additional question as to whether the appeal to the board was untimely filed.

With the exception of the latter case, which the board dismissed as untimely filed, the board decisions refused the capital stock tax and sales and use tax exemptions sought by the taxpayers.

## STATUTES AND REGULATIONS APPLICABLE

Section 602, the capital stock tax provisions, in the Tax Reform Code of 1971, Act of March 4, 1971, P.L. 6, *as amended*, 72 P.S. § 7602, imposes upon a corporate taxpayer a tax which is now the greater of a $75 minimum tax or an amount computed at the rate of 9 to 10 mills (depending upon the year) upon each dollar of defined capital stock value. Except as to the $75 minimum tax, the section declares that

> the provisions of this section *shall not apply to the taxation of the capital stock of entities organized for manufacturing, processing*, research or development purposes, which is invested in and actually exclusively employed in carrying on *manufacturing, processing*, research or development within the State.... (Emphasis added.)

The definitions section as to the capital stock tax § 601, 72 P.S. § 7601, does not define "manufacturing" but it does define "processing" in part as follows:

> 'Processing.' The following activities when engaged in as a business enterprise:
>
> . . . .
>
> (11) The publishing of books, newspapers, magazines or other periodicals, printing and *broadcasting radio and television programs by licensed commercial or educational stations.* (Emphasis added.)

The applicable sales and use tax provisions are also in the Tax Reform Code, where section 201, 72 P.S. § 7201, excludes from taxable sales all transfers for the purposes of

"manufacture" and "processing." Section 201, in pertinent part, also defines those terms as follows:

(c) 'Manufacture.' The performance of manufacturing, fabricating, compounding, processing or other operations, engaged in as a business, which place any personal property in a form, composition or character different from that in which it is acquired whether for sale or use by the manufacturer, and shall include, but not limited to —

(1) Every operation commencing with the first production stage and ending with the completion of personal property having the physical qualities (including packaging, if any, passing to the ultimate consumer) which it has when transferred by the manufacturer to another;

(2) The publishing of books, newspapers, magazines and other periodicals and printing;

. . . .

(d) 'Processing.' The performance of the following activities when engaged in as a business enterprise:

. . . .

(12) The broadcasting of radio and television programs *of* licensed commercial or educational stations. (Emphasis added.)

With respect to the exemption of broadcasting as a category of processing, one must particularly note that the capital stock tax provision exempts the broadcasting of radio and television programs "by" licensed commercial or educational stations, and the sales and use tax provision exempts the broadcasting of radio and television programs "of" licensed commercial or educational stations.

The Department of Revenue has promulgated, in the sales and use tax regulations, an administrative expansion of the broadcasting exemption including definitions of "licensed commercial or educational station" and of "Broadcasting," in 61 Pa.Code § 42.1 which, in its entirety, states:

### § 42.1. Definitions.

The following words and terms, when used in this chapter, have the following meanings, unless the context clearly indicates otherwise:

*A licensed commercial or educational station*—A licensed commercial station shall be defined in accordance with the following:

(i) A broadcasting station operating under one of the following Federal Communications Commission licenses is a licensed commercial or educational station:

(A) Standard broadcasting station

(B) Frequency modulation station

(C) Commercial television station

(D) Noncommercial television or FM radio station. Reference should be made to § 42.5 (relating to nonprofit educational stations).

(ii) Registered cable television companies operated under the authority of the Federal Communications Commission are not considered to be licensed commercial or educational stations, even though they are engaged in origination cable casting and access cable casting.

*Broadcasting*—The dissemination of radio or television communications intended to be received by the public, directly or by the intermediary of relay stations.

Also pertinent to these cases, in addition to the First and Fourteenth Amendments to the United States Constitution, is Pa. Const. art. VIII, § 1, which states:

### § 1. Uniformity of taxation.

All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws.

### ISSUES

As preserved by taxpayers Suburban/Lebanon and Warner, the issues are as follows:

1. Are cable television operators entitled to the same exemption from capital stock tax and sales and use tax that

is permitted to manufacturers; i.e., does the transformation of an electronic signal through the use of equipment and personnel, from a form that may not be viewed on a television set to one that may be viewed on a television set, constitute manufacturing under the capital stock and sales and use tax laws?

2. Are cable television operators entitled to the same processing exemption from capital stock tax and sales tax that is granted to television operators other than cable television; i.e., are cable television operators engaged as a business enterprise in the broadcasting of radio and television programs of or by licensed commercial or educational stations?

3. If the named tax laws impose, or are construed to impose, taxes upon the capital stock and equipment of cable television operators, when there is no imposition of those taxes on non-cable television operators, would such imposition or interpretation result in an unconstitutional denial of free speech under the First Amendment, discrimination under the Fourteenth Amendment or a violation of the uniformity clause of the Pennsylvania Constitution?

## FINDINGS OF FACT

As formal findings of fact in numbered paragraph form, the court hereby adopts paragraphs 1–6 inclusive of the Suburban/Lebanon Procedural Stipulation of Facts, paragraphs 1–15 inclusive of the Warner Procedural Stipulation of Facts, Paragraphs 1–49 inclusive of the Suburban/Lebanon Stipulation of Substantive Facts and paragraphs 1–53 inclusive of the Warner Stipulation of Facts, together with the exhibits appended to and incorporated within the Suburban/Lebanon stipulations and the exhibits appended to and incorporated within the Warner stipulations.

On the basis of an evidentiary hearing in this court, during which the trial judge received additional exhibits and testimony, the court makes the following additional findings of fact:

AF1. Lebanon and Suburban are operators of cable television systems headquartered in, respectively, Lebanon, Pennsylvania and Pottstown, Pennsylvania. Warner operates a cable television system in the City of Pittsburgh pursuant to a franchise agreement between Warner and the city on February 25, 1980. Suburban and Lebanon operate pursuant to formal authorization granted by local governmental bodies.

AF2. The physical plant involved in the cable television system is exemplified by Warner's facilities in Pittsburgh which include a television production studio, a control room, motor vehicle vans for electronic field production and news gathering, editing rooms, postproduction rooms, cable cost origination center, an audio/video equipment center, five neighborhood studios for community-originated programming for transmission over the cable system, a government studio for origination of programming by the City of Pittsburgh, facilities for the transmission of live church programs and sporting events, and facilities to originate alphanumeric programming, that is, the composition of letters and numbers to form graphic written communications ultimately displayed upon the screen of the viewer's television set.

AF3. The taxpayer cable television systems receive signals from the following sources:

Satellite signals

Microwave signals

Off-the-air television received by antenna

Playback of videotape in their own studios

Live programming in their own studios

Common carrier signals.

AF4. As indicated by the functions of the studios described above, the cable television systems originate programming from their own studios and from community studios, usually made available to public and community groups under the mandates of the municipal authorizations.

AF5. After technical operations are performed upon the received signals, the cable television systems then retransmit electronically converted signals, along with their own programming and local advertising, over a network of coaxial cables to viewer-subscribers whose televisions sets are connected to the cable lines and who pay a monthly fee for such reception.

Incorporated into this and the following finding is exhibit HH, Typical Block Diagram of Local Television Station Transmission System, set forth on the following page of this opinion.

EXHIBIT ··HH

Typical Block Diagram of Local Television Station Transmission System

RVM/Local Television Station Block Diagram

AF6. As shown, non-cable television operators receive signals from their own live programming, tape playback, satellites, microwaves and common carriers. The signal is then directed through switching equipment which is used to schedule the daily programming. After the switching is completed, the signal remains in the form of a base-band signal. The non-cable television system then processes the signal through a modulator which converts the base-band signal to a radio frequency, usually just one transmission

frequency in the case of a local television station. Non-cable television must also convert the modulated signal to an electromagnetic wave, much amplified in order to be transmitted over the air. After modulation and transmission through the air by a transmitter and antenna, a home television set can then receive that signal without further electronic processing.

AF7. Incorporated into this and the following finding is Exhibit II, Typical Block Diagram of Cable Television Transmission System, set forth on the following page of this opinion.

EXHIBIT II

Typical Block Diagram of Cable Television Transmission System
(N Channel Output).

AF8. A cable television system, receiving signals from the same classifications of sources as local television stations — live programming, tape, satellite, microwave, over-the-air — transmits those signals through switching equipment which allocates the respective signals to designated time periods. Then, unlike the non-cable television station, which is required to combine a variety of base-band signals into only one modulated radio frequency signal, the cable television system, because it is transmitting a multiple

number of channels, must employ a modulator for the respective radio frequency of each channel and thus must use as many modulators as there are channels, sometimes as many as 66 in number in this case. Additional processing by the cable television system then involves the combining of the multiple radio frequency signals into electronic states permitting them all to be transmitted over a coaxial cable network to the receivers. To maintain the strength of radio frequency signals so transmitted, the cable network includes amplifiers as necessary. Upon receipt by the viewer-subscriber's equipment, additional electronic equipment, owned by the cable television system or the subscriber or both, selects the frequency of the channel to be viewed. In addition, some frequencies are transmitted by the cable television system in scrambled form, subject to being unscrambled into viewable form by subscribers paying for such access.

AF9. Aside from the fact that cable television system subscribers pay fees for reception, a key difference between the non-cable television station and the cable television system is the mode of transmission to the viewer—(1) over the air by electromagnetic waves in the case of non-cable television stations, and (2) similar, less amplified radio frequencies, through coaxial cable to the viewer in the case of the cable television system. Another difference is that, as noted above, cable television systems normally have more expensive and numerous switching and modulating equipment because they are manipulating signals for transmission over a number of channels, as distinguished from the non-cable television station, whose output is normally just one television channel.

AF10. As established by expert testimony, some cable television systems in Pennsylvania, other than these taxpayers, also have an over-the-air transmission segment between the cable television origination point and the viewer. This segment is an amplitude modulated link or AML, which transmits signals from one cable facility to another, before the signal is transmitted through cables to viewers. The

Federal Communications Commission (FCC) must approve frequencies used in AML transmissions by cable television companies.

AF11. All cable television companies must file reports with the FCC each year, identifying all frequencies being used for television channels on the cable, as well as in AML technology. With respect to cable frequencies, FCC supervision exists because of the possibility of leakage out of the cable interfering with other signals on close frequencies. With respect to cable frequencies, the FCC does not affirmatively grant approval but does issue notifications of prohibition of the use of a particular frequency in a particular situation.

AF12. The video switching equipment and the frequency modulating equipment used by cable television systems is essentially the same equipment as the video switching equipment and frequency modulation equipment used by local television stations.

## DISCUSSION

### 1. Are Cable Television Systems Exempt From Tax As Being Engaged In Manufacturing?

■ Capital stock tax § 602 exempts the capital stock of entities organized for manufacturing except for the $75 minimum tax. The capital stock tax provisions do not define "manufacturing."

The Supreme Court of Pennsylvania, in *Bindex Corp. v. City of Pittsburgh*, 504 Pa. 584, 587, 475 A.2d 1320, 1322 (1984), reiterated its definition of manufacturing as

the application of labor skill to material whereby the original article is changed into a new different and useful article.... Whether or not an article is a manufactured product depends upon whether or not it has gone through a substantial transformation in form, qualities and adaptability in use from the original material, so that a new article or creation has emerged....

That case held that bookbinding constituted manufacturing. Recently, in *Ski Roundtop, Inc. v. Commonwealth*, 520 Pa. 227, 553 A.2d 928 (1989), the Supreme Court, applying the same definition, held that making snow from water constituted manufacturing, even though the man-made snow could, at warm temperature, revert to its original aqueous state.

Sales tax law § 201 defines "manufacture" as placing "any personal property in a form, composition or character different from that in which it is acquired."

Because one statute refers to "personal property" and the judicial expositions refer to "material," the taxpayers here must confront the point that the Supreme Court and the law have confined the subject matter dealt with by manufacturing to tangible matter. At this stage of jurisprudence in Pennsylvania, this court perceives the concepts of the legislature and the Supreme Court as bestowing the manufacturing exemption only upon dealings with such tangible matter, not dealings with electrical or electronic impulses.

The courts have held that the production of electricity is not entitled to the manufacturing exemption. *Potomac Edison Co. v. Commonwealth*, 50 Pa.Commonwealth Ct. 1, 411 A.2d 1287, *aff'd* 491 Pa. 432, 421 A.2d 214, *appeal dismissed*, 451 U.S. 901, 101 S.Ct. 1965, 68 L.Ed.2d 289 (1981). This court recognized the reality of the tangible-versus-material distinction by stating:

> The traditional legal concept assumes tangible 'material' as a starting point, and a continuity of existence of the material into the final product.

50 Pa.Commonwealth Ct. at 9, 411 A.2d at 1290.

Finally, controlling upon the manufacturing issue is *Golden Triangle Broadcasting, Inc. v. Pittsburgh*, 31 Pa.Commonwealth Ct. 547, 377 A.2d 839 (1977), *aff'd* 483 Pa. 525, 397 A.2d 1147 (1979), where this court and the Supreme Court held that the broadcasting of radio and television signals by KDKA in Pittsburgh did not constitute manufacturing. This court concluded that electrical signals and

microwaves did not constitute a product but rather only the means by which such broadcasting occurs, "more analogous to the provision of a service than the manufacture of a product." 31 Pa.Commonwealth Ct. at 560–62, 377 A.2d at 846–47. We also concluded that broadcasting essentially is the transmission of information rather than the manufacture of information. When the Supreme Court affirmed, the majority and dissenting opinions of that court indicate that the majority declined to accept the view of the dissenting justice, Mr. Justice Larsen, who would extend the manufacturing concept to a more technologically advanced concept, recognizing that dealing with electronic elements could constitute manufacturing.

In concluding that the activity involved here does not constitute exempt manufacturing, this court need not fall into the abysses established on each side of the issue by the Commonwealth or by the taxpayers.

Warner seeks to escape the broad thrust of *Golden Triangle* by confining its holding only to companies that derive their revenues from advertising, on Warner's theory that the judicial rationale applies only to the narrow process of inserting pre-produced advertisements into the programming. This court sees nothing in *Golden Triangle* which confines its holding on the basis of the source of revenues. Equally, we can see in the law no basis for excluding cable television systems from exemption because of their derivation of revenues from subscribers, as distinguished from the advertiser-supplied revenues received by commercial television stations and the donations received by nonprofit television stations.

On the other hand, *Golden Triangle* presented a definition of "broadcasting" upon which the taxpayers, rather than the Commonwealth, can logically rely when we later turn to the processing issue.

Although our Supreme Court has also held that the transforming of elements from liquid into a gaseous state constitutes manufacturing, *Commonwealth v. Air Products and Chemicals, Inc.,* 475 Pa. 318, 380 A.2d 741 (1977),

that decision does not break from the tangible matter distinction because a gas is obviously tangible matter, not intangible.

Accordingly, the conclusion must be that cable television stations are not entitled to the manufacturing exemption applicable under either the capital stock tax or the sales and use tax.

### 2. Does The Exclusion Of Cable Television Transmission From The Manufacturing Exemption Amount To An Unconstitutional Discrimination Or A Violation Of The First Amendment?

■ The United States Supreme Court and the federal courts have condemned invidious distinctions among classes of speakers as a violation of the First Amendment. *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987), *Minneapolis Star and Tribune v. Minnesota Commissioner of Revenue,* 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983).

Even under a strict scrutiny standard with respect to possible discriminations, a classification like that which this court perceives to exist in the Pennsylvania statutes and judicial doctrines — distinguishing between dealing with tangible matter on the one hand, and activities involving the manipulation and transmission of information through dealing with electrical and electronic elements — is a classification which is valid and rationally related to the purpose of the law. The manufacturing exemption is not the only exemption. To confine that exemption to dealing with tangible matter is a reasonable classification, particularly when both of these statutes extend exemptions, under other headings, to activities not involving the conversion of tangible matter, such as the processing exemption with which this court must next deal.

Therefore, this court's conclusion is that the tax laws in this case are not unconstitutional as written.

### 3. Are Cable Television Systems Entitled To The Processing Exemption From the Taxes?

In view of the language of the statutes and regulations recited above, analysis of this issue must proceed as follows:

a. Are cable television systems engaged in "broadcasting" television programs?

b. Are they engaged in broadcasting television programs "of licensed commercial or educational stations," with respect to sales tax?

c. Does cable television constitute broadcasting "by licensed commercial or educational stations," in the case of the capital stock tax?

Both the capital stock and sales tax statutes make clear that the "processing exemption" applies to the activities expressly enumerated. The statutes do not give a broad definition followed by non-exhaustive examples, as in the case of manufacturing. Both § 702 for sales tax and § 601 for capital stock tax limit "processing" to the listed activities.

Of course, because the common element of the processing categories is that they are "activities," the statutory language immediately suggests that the tangible matter touchstone of "manufacturing" does not apply, and the inclusion of "broadcasting" confirms that conclusion.

### a. Are Cable Television Systems Engaged In Broadcasting?

This court concludes that the activity of a cable television system does consist of "broadcasting," whether the term is defined according to ordinary dictionary parlance, according to judicial perception or according to administrative regulation.

Webster's Third New International Dictionary 280 (1986) defines "broadcasting" as

to make widely known, to disseminate or distribute widely or at random ... to send out from a transmitting station

(a radio or television program) for an unlimited number of receivers.

The word "broadcast," as an adjective, is defined as

made public by means of radio or television.

In a case noted above, this court has defined the essential function of broadcasting as "the *transmission* rather than the *manufacture* of visual and sound information." *Golden Triangle Broadcasting, Inc.,* 31 Pa.Commonwealth Ct. at 563, 377 A.2d at 847 (emphasis in original). Also, as noted above, this court described broadcasting as simply a "process of transporting or transmitting by electrical signals and microwaves, visual images and sounds to home viewers...." 31 Pa.Commonwealth Ct. at 562, 377 A.2d at 846–47.

On this definition, the Department of Revenue itself does not differ because, in 61 Pa.Code § 42.1, the official definition of broadcasting is:

*Broadcasting*—The dissemination of radio or television communications intended to be received by the public, directly or by the intermediary of relay stations.

Although the department may have envisaged "broadcasting" in past years as accomplishing the "dissemination" by the propagation of electromagnetic waves through the air, the precise language is apt and applicable to the cable television system's transmissions, both through the air and by cable, because, either way, they involve the dissemination of communications to the public and that dissemination is certainly accomplished "directly" when it is achieved by cable, just as when it is achieved by through-the-air transmitting.

b. Television Programs Of Licensed Stations —— The Sales Tax Wording

If the difference between the preposition "of" in the sales tax law and the preposition "by" in the capital stock tax law is stressed, the eligibility of cable television systems for the sales tax exemption would be clear. Engaged in broadcasting, as concluded above, they broadcast, among other

sources, the television programs *of* commercial or educational stations which are licensed by the FCC, even in the strict sense supported by the Commonwealth in this case.

However, even though the judicial responsibility of interpreting statutes might be accomplished most easily by extremely literal readings, this court must hesitate to permit the decision in a case like this to hinge upon the legislative choice of different prepositions in the middle of otherwise similar definitions. The important aspect of the definitions clearly appears to be the legislature's intention to confine the broadcasting category of the processing exemption to the dissemination of information in the form of programs identified with sources given governmental recognition and authorization.

    c.  Does The Cable Television Enterprise Constitute
        Broadcasting of Television Programs By A
        Licensed Commercial Or Educational Station?

The Department of Revenue, in 61 Pa.Code § 42.1, has promulgated a regulation drawing from the statutory phrase "licensed commercial or educational station" the concept that only television stations licensed as such by the Federal Communications Commission can qualify. The department sought to nail down the point by the express exclusion of cable television systems in the portion of the regulation which declares that

    (ii) Registered cable television companies operated under
    the authority of the Federal Communications Commission
    are not considered to be licensed commercial or education-
    al stations, even though they are engaged in origination
    cablecasting and access cablecasting.

Because licensing obviously refers to the existence or conduct of an activity under the authority of government, one must question the rational basis for the department's distinction which, after acknowledging that cable television systems are registered and operated under the authority of the FCC, they are not considered to be licensed.

There is no dispute on this record as to the differing nature of the licensing applicable to over-the-air television

stations on the one hand, and cable television systems on the other hand. In addition to the FCC's licensing of the former as such, all parties acknowledge that cable television systems are registered with the FCC and are subject to FCC regulation with respect to their employment of frequencies, particularly where AMF is involved in part of their chain of transmission.

In addition, as the exhibits and stipulation make clear, cable television systems generally must obtain franchises from municipal governments for the use of public rights-of-way and customarily are subjected to stringent conditions by the local governments, including the requirement of providing facilities and transmission time for the transmission of public information sources, from the local government itself as well as community groups. Most significantly, local government authorization of cable television systems has generally involved local government control of and approval of the rates charged by cable television systems to subscribers.

When we apply judicial scrutiny to the processing exemption, the conclusion must be that distinguishing between two substantial sources of public information dissemination upon the basis of the type of licensing would be an invidious distinction whether examined under the equal protection clause of the Fourteenth Amendment, under the uniformity clause of the Pennsylvania Constitution or under the First Amendment, where the United States Supreme Court has admonished us to avoid discrimination among speakers.

This court cannot perceive, and the Commonwealth has not suggested, any rational relationship between the identity of the authorizing government and the matter of subjection to capital stock or sales and use tax. Why should information-transmitting media be encouraged and fostered by tax exemption when the governmental authority for its existence is a federal agency, while other information-transmitting media, disseminating the *same* sources of information and more besides, are denied exemption because the authorizing government is primarily local government and only incidentally the federal government?

To interpret the statute as limiting the exemption only to taxpayers existing under federal authority, as the administrative regulation would do, goes too far. By that limitation, the interpretation mandated by the regulation does result in an unconstitutional distinction.

Accordingly, this court concludes that the taxpayers are entitled to the processing exemption by virtue of being engaged in the broadcasting of television programs of *and* by licensed commercial or educational stations.

### 4. Was Warner's Filing In The Wrong Office Not Entitled To Acceptance By The Board?

█ The board has rejected Warner's petition for reassessment in the appeal at 1510 C.D.1985 because Warner's counsel filed that petition with the Board of Appeals of the Department of Revenue in Harrisburg rather than with the Board of Finance and Revenue in Harrisburg. Warner's counsel telephoned the department to learn where to file the petition with the Board of Finance and Revenue. The department personnel advised delivery to the 10th Floor, Strawberry Square, Harrisburg, PA. At that location counsel asked directions to the Board of Finance and Revenue and, at the office indicated, the petition was accepted and date-stamped. More than two months later, the Board of Appeals informed Warner that it had accepted the petition in error and that it was sending it to the Board of Finance and Revenue in the Finance Building in Harrisburg. The Board of Finance and Revenue refused to accept jurisdiction or to treat it as timely filed, which it would have been if the January 7 filing date with the Board of Appeals were treated as acceptable in relation to a Board of Appeals action involved.

Under the Tax Reform Code § 234, 72 P.S. § 7234, a petition for review with the Board of Finance and Revenue must be filed within sixty days after the date of mailing of notice by the department.

The Judicial Code, 42 Pa.C.S. § 5103, provides that appeals wrongly filed in a "tribunal" will not be deemed

unfiled but will be treated as filed in the proper court — if the law designates a court — as if originally filed in the transferee court on the date filed in the erroneous place. Because that Judicial Code section, 42 Pa.C.S. § 5103(d) defines "tribunal" to include agencies similar to the Board of Claims and Board of Property, we deem that the Board of Finance and Revenue and the Board of Appeals are tribunals. Reasoning by analogy, if a court case wrongly filed in an administrative tribunal is to be treated as if correctly filed, then an administrative proceeding filed with the wrong tribunal should, a fortiori, be treated as if filed in the correct one.

Whether this matter be thus treated as an allowable transfer, with the original time of filing preserved, or, alternatively, as the allowance of an appeal nunc pro tunc, the appeal should be deemed effective.

An appeal nunc pro tunc is allowable when there is "fraud or some breakdown" in the tribunal's operation "through a default of its officers, whereby the party has been injured." *Township of Franklin,* 2 Pa.Commonwealth Ct. 496, 276 A.2d 549 (1971). Here the personnel of the Commonwealth contributed to the erroneous filing place. Because the filing in that place was timely, and because that place was within the jurisdiction of the Secretary of Revenue, one of the members of the Board of Finance and Revenue, the transfer, with the time of filing preserved, is warranted.

None of the cases cited by the Commonwealth on this point are germane.

## CONCLUSION

Accordingly, the decisions of the Board of Finance and Revenue will be reversed in all of the cases consolidated within this appeal.

## ORDER

NOW, February 14, 1990, the decision of the Board of Finance and Revenue is reversed, subject to the filing of exceptions under Pa.R.A.P. 1571(i). The Chief Clerk shall

enter a judgment of reversal if no exceptions are filed within 30 days after the entry of this order.

DOYLE, Judge, concurring and dissenting.

I am in complete agreement with the scholarly analysis on the substantive issues which is set forth in the majority opinion. I dissent only from that portion of the opinion which holds that pursuant to Section 5103 of the Judicial Code, 42 Pa.C.S. § 5103, an administrative tribunal may transfer a case erroneously filed to another tribunal. Section 5103 provides in relevant part:

(a) **General rule.**—If an appeal or other matter is taken to or brought in a court or magisterial district of this Commonwealth which does not have jurisdiction of the appeal or other matter, the court or district justice shall not quash such appeal or dismiss the matter, but shall transfer the record thereof to the proper tribunal of this Commonwealth, where the appeal or other matter shall be treated as if originally filed in the transferee tribunal on the date when the appeal or other matter was first filed in a court or magisterial district of this Commonwealth. A matter which is within the exclusive jurisdiction of a court or district justice of this Commonwealth but which is commenced in any other tribunal of this Commonwealth shall be transferred by the other tribunal to the proper court or magisterial district of this Commonwealth where it shall be treated as if originally filed in the transferee court or magisterial district of this Commonwealth on the date when first filed in the other tribunal.

. . . .

(d) **Definition.**—As used in this section "tribunal" means a court or district justice or other judicial officer of this Commonwealth vested with the power to enter an order in a matter, the Board of Claims, the Board of Property, the Office of Administrator for Arbitration Panels for Health Care and any other similar agency.

A straightforward reading of this language discloses no basis for permitting one tribunal to transfer a case to another. When the legislature amended Section 5103 in

1982 in order to permit a *court* to transfer a case to a tribunal or vice versa, it was clearly aware of the limitation it placed upon transfer. It specifically chose to allow transfers only between (1) courts and tribunals and (2) courts and other courts or divisions thereof. Had the legislature wished to allow for transfers among tribunals it would have clearly said so in the statute.

I believe the majority's holding on this point constitutes an unwarranted expansion of Section 5103 that may haunt administrative agencies in the future. Extending Section 5103 to permit tribunal to tribunal, state agency to state agency, transfers (*e.g.*, a misfiled petition before the Board of Claims may be transferred to the Board of Appeals at the Department of Revenue or the Public Utility Commission) is not analogous to the transfers specifically permitted by Section 5103, and hence, is unwarranted.

McGINLEY, J., joins in this concurring and dissenting opinion.