**SUBURBAN CABLE TV CO., INC., Appellant,**

v.

**CITY OF CHESTER.**

Commonwealth Court of Pennsylvania.

Argued Oct. 9, 1996.
Decided Nov. 14, 1996.

Howard M. Soloman, Philadelphia, for Appellant.

Bruce E. LaRoche, Philadelphia, for Appellee.

Before COLINS, President Judge, and DOYLE, McGINLEY, SMITH, FRIEDMAN, FLAHERTY and LEADBETTER, JJ.

COLINS, President Judge.

Suburban Cable TV Company (Suburban Cable) appeals from the January 9, 1996 order of the Court of Common Pleas of Delaware County (Common Pleas) sustaining the City of Chester's (City) business privilege tax assessment against Suburban Cable for the years 1986 through 1993. We affirm.

After an audit initiated by Municipal Tax Bureau (MTB), its appointed tax collector,[1] the City assessed its business privilege tax on the gross volume of Suburban Cable's receipts for the privilege of carrying on its business activities in the City. Suburban Cable appealed the assessment asserting 1) that the City has no authority to impose the tax because Section 2(4) of the LTEA, 53 P.S. § 6902(4), prohibits local governments from taxing any privilege, act, or transaction related to the business of manufacturing or transportation of manufactured goods (the so-called manufacturing exemption); 2) that the contingency fee arrangements between the City and MTB, and between MTB and its auditor, violate public policy in that compensation is based on a percentage of taxes recovered; and 3) that imposition of the business privilege tax, in addition to the franchise fee paid to the City, constitutes double taxation in violation of the Pennsylvania Constitution.

After evidentiary hearings, at which both parties presented expert testimony on the nature of the Suburban Cable's business, Common Pleas concluded 1) that Suburban Cable is not engaged in manufacturing for the purposes of the manufacturing exemption, 2) that its liability to pay the tax is unaffected by the auditors' contingency fee agreement, and 3) that the imposition of the tax does not constitute double taxation. On appeal, Suburban Cable raises only the first two issues.

### Manufacturing Exemption

Under Section 2(4) of the LTEA, local taxing authorities have no authority "[t]o levy, assess and collect a tax on goods and articles manufactured in such political subdivision ... or on any privilege, act or transaction related to the business of manufacturing ... [.]" 53 P.S. § 6902(4). The term "manufacturing," as used in the exemption provision of the LTEA, means transformation of material or things into something different from that received, and the differ-

---

1. Pursuant to the authority granted in Section 10 of The Local Tax Enabling Act (LTEA), Act of December 31, 1965, P.L. 1257, *as amended*, 53 P.S. § 6910, the City appointed MTB as its tax collector. The agreement between MTB and the City provided for compensation in the amount of 2.3 percent of current taxes collected, 25 percent of delinquent taxes collected, and 33 and one-third percent of amounts collected from unregistered taxpayers. (Suburban Cable Exhibit 25.) In the context of the present controversy, Suburban Cable would qualify as an unregistered taxpayer, as one engaged in a taxable activity but not registered on the City's tax rolls for such tax.

ence cannot be a superficial change that does not alter or change the thing; what is required is that the basic materials or goods be given a new identity that can easily be traced to the producer and that must be the product of skill and labor. *Bindex Corporation v. City of Pittsburgh,* 504 Pa. 584, 475 A.2d 1320 (1984). The transformation must be a substantial transformation in form, qualities, and adaptability in use.

In *Suburban Cable TV Co., Inc. v. Commonwealth,* 131 Pa.Cmwlth. 368, 570 A.2d 601 (1990), *affirmed,* 527 Pa. 364, 591 A.2d 1054 (1991), we considered whether cable television operations are engaged in manufacturing for the purposes of exemptions from the Commonwealth's capital stock tax [2] and sales and use taxes.[3] Citing our earlier decisions in *Potomac Edison Company v. Commonwealth,* 50 Pa.Cmwlth. 1, 411 A.2d 1287, *affirmed,* 491 Pa. 432, 421 A.2d 214 (1980), *appeal dismissed,* 451 U.S. 901, 101 S.Ct. 1965, 68 L.Ed.2d 289 (1981), and *Golden Triangle Broadcasting, Inc. v. City of Pittsburgh,* 31 Pa.Cmwlth. 547, 377 A.2d 839 (1977), *affirmed,* 483 Pa. 525, 397 A.2d 1147 (1979), we held that cable television systems are not entitled to the manufacturing exemptions applicable to the capital stock and sales and use taxes. In so concluding we noted that the legislature and the Pennsylvania Supreme Court "have confined the subject matter dealt with by manufacturing to tangible matter." *Suburban Cable,* 570 A.2d at 607. We further noted that cable transmissions (i.e., electrical signals) do not constitute a product; rather they constitute a service. *Id.* at 608. Our legal conclusion in *Suburban Cable,* that cable television systems are not entitled to a manufacturing exemption, is binding in this case and determinative on this issue.[4]

Aside from the issue of a tangible versus intangible product, the cable television sys-

tem does not qualify for the manufacturing exemption because Suburban Cable does not transform any material or thing into something different from that received. The Suburban Cable system primarily consists of video switching equipment, computers, modulators and demodulators, receivers and transmitters, scramblers and descramblers, signal converters, monitor and testing equipment, an antenna, and satellite dishes. (Common Pleas Opinion at p. 2.) Signals originating from several sources [5] are received in signal processing facilities, where they are converted and otherwise processed for cable transmission, (Stipulated Facts Nos. 17 and 18), and assigned to cable channels. Suburban Cable does not give the incoming signals a new identity; rather, it processes the signals and retransmits them in a single package or format. The processing and retransmission do not constitute a substantial transformation in form, qualities, and adaptability in use. Suburban Cable provides a service whereby it delivers to customers the products (i.e., the channels) produced by the individual networks, broadcasters, and others.

**The Contingent Fee Arrangement**

■ In its appeal petition to Common Pleas, Suburban Cable raised its claim that the contingent fee arrangements between the City and MTB and between MTB and its auditor violate public policy in that compensation paid to both the assessor and the auditor is based on a percentage of taxes recovered. In its post-trial brief, Suburban Cable addressed the public policy claim, and at that time it added a due process claim. The due process claim relates to the validity of the contracts in that Suburban Cable claims that neither the agreement between the City and MTB nor the agreement between MTB and the auditor was the subject of an ordinance or resolution.[6] The public

---

2. Section 601 of the Tax Reform Code of 1971 (Code), Act of March 4, 1971, P.L. 6, *as amended,* 72 P.S. § 7601.

3. Section 201 of the Code, 72 P.S. § 7201.

4. Although *Suburban Cable* dealt with manufacturing exemptions under tax statutes other than the LTEA, the courts of this Commonwealth rou-

tinely apply the same analysis in all three contexts. *See e.g., Golden Triangle.*

5. Over-the-air signals, microwave signals, fiber optics, and satellite. (Stipulated Fact No. 17.)

6. Section 10 of the LTEA authorizes a political subdivision "to provide by ordinance or resolution" for the creation or appointment of a tax collector/assessor.

policy claim and the due process claim are two separate claims: the public policy claim relates to the compensation scheme, and the due process claim relates to the validity of the contracts.

■ Common Pleas did not err in its conclusion that Suburban Cable waived its due process claim because it never argued the validity of the contracts and submitted no evidence on the issue. The public policy claim, however, was properly raised, the contracts were submitted into evidence, and the issue was preserved. In support of its public policy claim, Suburban Cable cites no applicable Pennsylvania cases. Most of the cited authority consists of cases from the late 1800s and early 1900s; however, we find two more current cases instructive.

In *Sears, Roebuck & Co. v. Parsons*, 260 Ga. 824, 401 S.E.2d 4 (1991), the Georgia Supreme Court declared a county's contingent fee contract with a tax auditor void as against public policy. The Georgia court reasoned that the power to tax rests exclusively with the government and that people's entitlement to fair and impartial tax assessment would be jeopardized where a private organization had a financial stake in the amount of tax collected. *Id.*

Not disputing the government's exclusive power to tax or the citizenry's entitlement to fair and impartial tax assessment, the Supreme Court of North Carolina reached the opposite conclusion in *Appeal of Philip Morris U.S.A.*, 335 N.C. 227, 436 S.E.2d 828 (1993), *cert. denied sub nom. Philip Morris Inc. v. Cabarrus County*, — U.S. ——, 114 S.Ct. 2726, 129 L.Ed.2d 850 (1994). Applying the general rule that questions of public policy are for legislative determination, the North Carolina court found that the North Carolina legislature had, in other instances, specifically prohibited contingent fees in settings where it had deemed them to be contrary to public policy. The court concluded that "had the General Assembly intended that private tax auditors employed to assist county tax assessors be restricted to an hourly wage or to fixed fee remuneration, it

would have expressly said so." *Id.,* 436 S.E.2d at 831.

Adopting the reasoning of the North Carolina court in *Philip Morris,* we have determined that, like the North Carolina legislature, the Pennsylvania legislature has specifically prohibited contingent fee agreements where it has deemed them to be contrary to public interest. For example, Pennsylvania law prohibits real estate appraisers from accepting an appraisal assignment where the fee is contingent on the valuation reached.[7] Had the Pennsylvania legislature intended, it could have expressly prohibited political subdivisions from hiring tax collectors and assessors under contingent fee agreements. As local governments increasingly turn to private tax collectors and auditors with the legislature's approval, we must assume that the legislature knows how such arrangements are structured and does not foresee that private collectors and auditors will turn into tax bounty hunters threatening the public's right to fair and impartial tax assessment.

■ Although Common Pleas may have erred in concluding that the public policy issue was waived, we agree with its conclusion that a decision either way on that issue would not affect Suburban Cable's liability to pay the tax. Even if we were to declare the contingent fee arrangements against public policy, the remedy would be to invalidate the arrangement, and possibly the audit, not the assessment. The City properly assessed its business privilege against Suburban Cable; nothing in the record indicates that the City did so without some independent determination that the tax was properly applied, and Suburban Cable did not contest the amount of the assessment.

In conclusion, Suburban Cable is not exempt from the City's business privilege tax under the LTEA's manufacturing exemption, and the contingent fee arrangements between the City and MTB and between MTB and the auditor are not contrary to public

---

7. Section 11(a)(10) of the Real Estate Appraisers Certification Act, Act of July 10, 1990, P.L. 404,

63 P.S. § 457.11(a)(10).

policy. Accordingly, the order of the Court of Common Pleas is affirmed.

### ORDER

AND NOW, this 14th day of November, 1996, the order of the Court of Common Pleas of Delaware County in the above-captioned matter is affirmed.