**BELL ATLANTIC MOBILE SYSTEMS, INC.,**
**Petitioner,**

v.

**COMMONWEALTH of Pennsylvania,**
**Respondent.**

**AWACS, Inc., Petitioner,**

v.

**Commonwealth of Pennsylvania,**
**Respondent.**

Commonwealth Court of Pennsylvania.

Argued March 13, 2002.
Decided May 28, 2002.

Joseph C. Bright, Philadelphia, for Bell
Atlantic Mobile Systems.

James L. Fritz, Harrisburg, for
AWACS, Inc.

Karen M. Gard, Harrisburg, for respondent.

Before COLINS, President Judge, and
McGINLEY, Judge, SMITH–RIBNER,
Judge, PELLEGRINI, Judge,
FRIEDMAN, Judge, COHN, Judge, and
LEAVITT, Judge.

OPINION BY Judge McGINLEY.

Bell Atlantic Mobile Systems, Inc. (Bell)
and AWACS, Inc. (AWACS) (collectively,
Taxpayer) petition for review[1] from an
order of the Pennsylvania Board of Finance and Revenue (Board) that reassessed the sales and use tax and interest
against Bell and sustained the decision of
the Board of Appeals' assessment against
AWACS.

Taxpayer and the Commonwealth of
Pennsylvania (Commonwealth) stipulated
to the following:

2. Taxpayer is a for-profit corporation
engaged in the business of producing
and selling mobile domestic cellular radio telecommunications service, sometimes referred to as cellular radiotelephone service. Such service is referred
to herein as "Cellular Telecommunications Service" or "CTS."

3. CTS is a form of commercial mobile
radio service. Taxpayer sells CTS to
individual, commercial, industrial and institutional customers in Pennsylvania
and elsewhere. Taxpayer also sells Cellular Telecommunications Service to other cellular system providers for their
customers who engage in cellular communications while in Taxpayer's operational area. (A customer of CTS provider A, who is using cellular service in
provider B's service area, is referred to
as "roaming"). Taxpayer also provides

1. On September 21, 2001, this Court granted
Bell's and AWACS' petition for application for
consolidated argument.

services to a minor extent at wholesale to resellers for resale to retail customers. *In describing Taxpayer's activity as "producing", or the "production" of, CTS or a part thereof, the parties make no stipulation whether the activity constitutes manufacturing, processing, or producing public utility service for Sales and Use Tax purposes.* (emphasis added).

4. The Federal Communications Commission ('FCC') has granted Taxpayer licenses to provide Cellular Telecommunications Service over assigned frequencies, within each of Taxpayer's designated cellular service areas. The terms of the license require Taxpayer to construct and operate facilities and provide service throughout the designated service area within certain time deadlines.

. . . .

10. In order to produce Cellular Telecommunications Service, Taxpayer purchases various items, including but not limited to the following, which are used in providing Cellular Telecommunications Service:

electricity for nonresidential use (sometimes referred to as "commercial electricity")

radio transmitting and receiving equipment

radio signal antennas

electronic signal filtering and processing equipment

electronic signal amplifiers

signal switching equipment

intrastate and interstate telephone service for nonresidential use

telecommunications services provided by entities other than Taxpayer

*Each of these items constitutes tangible personal property for Sales and Use Tax purposes.* (emphasis added).

. . . .

37. Since about 1970, the Department of Revenue and the Board of Finance and Revenue have maintained and implemented a policy to treat producers of electricity as manufacturers for Sales and Use Tax purposes and have determined that the machinery, equipment and supplies used by a producer of electricity qualify for the manufacturing exclusion for Sales and use tax purposes. . . .

. . . .

48. *The Commonwealth extends to a taxpayer the public utility exclusion for Sales and Use Tax purposes where the taxpayer provides services to the general public, without discrimination, which are subject to regulation by a governmental authority, such as the Pennsylvania Public Utility Commission or comparable federal agency, even though the agency's regulation does not extend to rates* . . . . (emphasis added).

Joint Partial Stipulation of Facts, September 10, 2001, Paragraphs 2–4, 10, 37, and 48 at 2, 4, 25, and 28.

Bell was audited for the period from January 1, 1989, to April 30, 1991, (state) and October 1, 1991, to April 30, 1993, (local) and "[a]s a result of an audit, the Department of Revenue issued Assessment No. A–76980 . . . for state sales tax of $773.51, use tax of $203,975.09, interest of $74,696.63, and penalties of $10,237.42 for a total state assessment in the amount of $289,682.65; and the Department issued Assessment No. A–76985 . . . for local use tax of $11,627.88, interest of $3,757.42 and penalties of $636.25 for a total local assessment of $16,021.55." Partial Stipulation of Facts between Bell and the Commonwealth, Paragraph 3 at 1. Bell's assessed items included amplifiers, antennas, switching and testing equipment. Bell appealed the state and local assessments to the Board and contended that it was a

manufacturer or alternatively, a processor, and was exempt from the sales and use tax. Bell sought relief of $177,604.04 from the sales and use tax and $10,937.97 from the local use tax. The Board abated the penalties imposed but sustained the tax and interest assessment.

AWACS sought a refund of the sales tax in the amount of $3,002,816.79 and, like Bell, contended that its services qualified for the manufacturing and/or processing exclusion. The Board sustained the decision of the Board of Appeals.

■■■ On appeal[2] Taxpayer contends that it manufactures CTS and is entitled to the "manufacturing" exclusion from the sales and use tax under Section 201 of the Tax Reform Code of 1971 (Tax Code)[3], 72 P.S. § 7201 and that Taxpayer is also entitled to an exclusion because it is a public utility.

### Is Taxpayer a Manufacturer?

■■ Section 202 (imposition of tax) of the Tax Code, 72 P.S. § 7202 provides:

(a) There is hereby imposed upon each separate sale at retail of *tangible personal property* or services, defined herein, within this Commonwealth a tax of six per cent of the purchase price, which tax shall be collected by the vendor from the purchaser, and shall be paid over to the Commonwealth as herein provided. (emphasis added).

Section 201(m) of the Tax Code, 72 P.S. § 7201(m) defines the term "tangible personal property" as "[c]orporeal personal property including but not limited to ... interstate telecommunication service originating or terminating in the Commonwealth and charged to a service address in this Commonwealth, intrastate telecommunications services[4] originating and terminating in the Commonwealth ...."

Section 201(c) of the Tax Code, 72 P.S. § 7201(c) defines the term "manufacture" as:

The performance of manufacturing, fabricating, compounding, processing or other operations, engaged in as a business, *which place any tangible personal property in a form, composition or character different from that in which it is acquired whether for sale or use by the manufacturer* .... (emphasis added).

Therefore, in order to qualify for an exclusion from the sales and use tax, the manufacturer must change the tangible

---

2. Although this Court hears appeals from an order of the Board of Finance and Revenue in our appellate jurisdiction, this Court functions essentially as a trial court. *Norris v. Commonwealth,* 155 Pa.Cmwlth. 423, 625 A.2d 179 (1993); Pa. R.A.P. 1571 (Determinations of the Board of Finance and Revenue). "The stipulation of facts is binding and conclusive upon this Court, but we may draw our own legal conclusions from those facts." *Id.* at 182, *citing Suburban/Bustleton Pharmacy v. Department of Aging,* 134 Pa.Cmwlth. 71, 579 A.2d 426 (1990).

3. Act of March 4, 1971, P.L. 6, *as amended.*

4. Section 201(rr) of the Tax Code, 72 P.S. § 7201(rr) defines the term "telecommunications services" as:

Any one-way transmission or any two-way, interactive transmission of sounds, signals or other intelligence converted to like form which effects or is intended to effect meaningful communications by electronic or electromagnetic means via wire, cable, satellite, light waves, microwaves, radio waves or other transmission media. The term includes all types of telecommunication transmissions, such as local, toll, wide-area or any other type of telephone service; private line service; telegraph service; radio repeater service; wireless communication services; personal communications system service; cellular telecommunication service; specialized mobile radio service; stationary two-way radio service; and paging service....

personal property from its original composition into a different form or product.[5]

Taxpayer asserts that the manufacture of CTS involves the application of labor and skill in order to transform the tangible personal property of electricity and various signals into different signals.[6]

The question whether a Taxpayer who provides these types of services is a manufacturer entitled to the exclusion under Section 201(c) of the Tax Code has not been addressed by our Pennsylvania courts. However, our prior decisions contain a rationale which is relevant and controlling.

In *Suburban Cable TV Co., Inc. v. Commonwealth*, 131 Pa.Cmwlth. 368, 570 A.2d 601 (1990), (*Suburban Cable I*), *affirmed*,

527 Pa. 364, 591 A.2d 1054 (1991), Warner Cable Corporation of Pittsburgh and Warner Amex Cable Communications, Inc. (Warner) sought an exclusion from the sales and use tax in addition to the capital stock tax.[7] Warner contended that "the transformation of an electronic signal through the use of equipment and personnel, from a form that may not be viewed on a television set to one that may be viewed on a television set constitute[d] manufacturing under the ... sales and use tax laws ...." *Id.* at 603. This Court rejected Warner's argument:

At this stage of jurisprudence in Pennsylvania, this court perceives the concepts of the legislature and the Supreme Court as bestowing the manufacturing exemption[8] only upon dealings with

---

5. In *Lancaster Laboratories, Inc. v. Commonwealth*, 148 Pa.Cmwlth. 465, 611 A.2d 815, 817 (1992), *affirmed*, 534 Pa. 392, 633 A.2d 588 (1993) this Court stated:

[A]lthough the regulatory requirement of a 'different product' is not expressly stated in the statute, manufacturing under § 201(c)(1) must include transformed property for sale or use by the manufacturer that is passed ultimately to the consumer or another manufacturer which is necessarily a different product with a distinctive name, character and use.

6. Specifically, Taxpayer describes the manufacturing process as follows:

20.14 ... Taxpayer's cell site equipment transforms commercial electricity and the signal from the cell site antenna into the higher, intermediate frequency electronic signal which is encoded with the intellectual content (voice-derived or data) to be conveyed. Then, if the transmission to the MSC [mobile switching center] is by wire, Taxpayer's cell site equipment transforms additional commercial electricity and the intermediate electronic signal into a new electronic signal similarly encoded for transmission over the T line to the MSC. Where transmission to the MSC is by optical cable, Taxpayer's cell site laser equipment transforms additional commercial electricity and the intermediate signal into

a light wave signal (i.e., a stream of photons) for transmission over the optic cable to the MSC. The cell site laser equipment transforms additional commercial electricity and the intermediate electronic signal by causing them to stimulate laser-generating material to emit radiation in the form of a lightwave signal similarly encoded. Where transmission to the MSC is by microwave, Taxpayer's cell site equipment transforms additional commercial electricity and the intermediate frequency signal to produce the higher-frequency microwave signal similarly encoded, which is then transmitted to the MSC. A microwave signal is a form of high frequency electromagnetic radiation. In each of these cases, the energy in the commercial electricity and in the intermediate electronic signal become the energy in the electronic, lightwave or microwave signal that is transmitted to the MSC.

Joint Partial Stipulation, Paragraph 20.14 at 13.

7. Suburban Cable TV Co., Inc. (Suburban) sought an exclusion from the capital stock tax only. *See* Section 602 (imposition of tax-capital stock), 72 P.S. § 7602.

8. Although this Court referred to exemption in relation to manufacturing, Section 204 of the Tax Code, 72 P.S. § 7204 refer to "exclusion from tax."

such tangible matter, not dealings with electrical or electronic impulses.

The courts have held that the production of electricity is not entitled to the manufacturing exemption.... This court recognized the reality of the tangible-versus-material distinction by stating:

> The traditional legal concept assumes tangible 'material' as a starting point, and a continuity of existence of the material into the final product.

> ....

Finally, controlling upon the manufacturing issue is *Golden Triangle Broadcasting, Inc. v. City of Pittsburgh,* 31 Pa.Cmwlth. 547, 377 A.2d 839 (1977), aff'd. 483 Pa. 525, 397 A.2d 1147 (1979), where this Court and the Supreme Court held that the broadcasting of radio and television signals by KDKA in Pittsburgh did not constitute manufacturing. This court concluded that electrical signals and microwaves did not constitute a product but rather only the means by which such broadcasting occurs, 'more analogous to the provision of a service than the manufacture of a product.' 31 Pa.Cmwlth. at 560–62, 377 A.2d at 846–47. We also concluded that broadcasting essentially is the transmission of information rather than the manufacture of information. When the Supreme Court affirmed, the majority and dissenting opinions of that court indicate that the majority declined to accept the view of the dissenting justice, Mr. Justice Larsen, who would extend the manufacturing concept to a more technologically advanced concept, recognizing that

dealing with electronic elements could constitute manufacturing.

*Id.* at 607–08.

In *Suburban Cable TV Co., Inc. v. City of Chester,* 685 A.2d 616, 618 (Pa.Cmwlth. 1996),[9] (*Suburban Cable II* ), this Court reaffirmed our decision in Suburban Cable I and added:

> [W]e noted that the legislature and the Pennsylvania Supreme Court 'have confined the subject matter dealt with by manufacturing to tangible matter ... We further noted that cable transmissions (i.e., electrical signals) do not constitute a product; rather they constitute a service .... Our legal conclusion in Suburban Cable, that cable televisions are not entitled to a manufacturing exemption, is binding in this case and determinative on this issue.

> *Aside from the issue of a tangible versus intangible product, the cable television system does not qualify for the manufacturing exemption because Suburban Cable does not transform any material or thing into something different from that received.* The Suburban Cable system primarily consists of video switching equipment, computers, modulators and demodulators, receivers and transmitters, scramblers and descramblers, signal converters, monitor and testing equipment, an antenna, and satellite dishes .... Signals originating from several sources are received in signal processing facilities, where they are converted and otherwise processed for cable transmission ... and assigned to cable channels. *Suburban does not give the incoming signals a new identity;*

9. In *Suburban Cable II,* Suburban Cable contended that the City of Chester could not impose a business privilege tax assessment against it "because Section 2(4) of the LTEA [The Local Tax Enabling Act, Act of December 31, 1965, P.L. 1257, *as amended* ], 53 P.S. § 6902(4), prohibited local governments from taxing any privilege, act, or transaction related to the business of manufacturing or transportation of manufactured goods ...." *Id.* at 617. Although *Suburban Cable II* involved the manufacturing exemption under the LTEA, this Court also rejected the manufacturing argument.

*rather, it processes the signals and retransmits them in a single package or format. The processing and retransmission do not constitute a substantial transformation in form, qualities, and adaptability in use. Suburban Cable provides a service whereby it delivers to customers the products (i.e., the channels) produced by the individual networks, broadcasters, and others.* (citations and footnote omitted, emphasis added).

Here, Taxpayer's service involves a subscriber's mobile unit which converts the sound waves of the human voice into a signal. Taxpayer's equipment captures the signal, amplifies it and then transmits it. The recipient's mobile unit receives and restructures the signal and produces sound waves that are similar to the subscriber's/caller's input. Taxpayer's service commences with radio waves, the caller's message, and terminates with radio waves, a replica of the caller's message. Taxpayer transports an electronic signal, that may be converted to a light or laser signal, which may in turn be changed in frequency and voltage. However, the content, i.e., the encoded communication, remains the same. Although the signals may change in some respects the informational content of the signal remains the same. Like the electrical or electronic impulses in *Suburban Cable I* and the cable transmission in *Suburban Cable II*, the conversion of the sound waves of the human voice into a signal and its transmittal does not qualify for the manufacturing exclusion.

### Is Taxpayer a Manufacturer Because Telecommunications Services are Tangible Personal Property?

■ Taxpayer also asserts that Section 201(m) of the Tax Code, 72 P.S. § 7201(m)

was amended to include in the definition section of "tangible personal property", "telecommunication services." Taxpayer maintains that because CTS is now considered "tangible personal property" it is entitled to the manufacturing exclusion. This Court is constrained to disagree.

First, the inclusion of "telecommunication service" in the definition of "tangible personal property" did nothing more than establish that CTS is subject to the sales and use tax. Second, to interpret Section 201(m) of the Tax Code to extend the manufacturing exclusion to a "telecommunication service" solely because "telecommunication service" is defined as "tangible personal property" would require the Court to ignore the statutory definition of manufacturing and create an absurd result. Third, as noted, Taxpayer was required, and failed, to satisfy the definitional requirements of "manufacturing" in order to qualify for the exclusion.

### Is Taxpayer a Public Utility?

■ Taxpayer contends that it is entitled to an exclusion from the sales and use tax because (1) Taxpayer performs services for the general public without discrimination (2) Taxpayer is licensed by the Federal Communications Commission (FCC) as a common carrier and (3) Taxpayer's service is highly regulated. Taxpayer also contends that the application of the public utility exclusion to cellular carriers would prevent tax pyramiding.[10]

Pursuant to Section 201(k)(8)(C) of the Tax Code, 72 P.S. § 7201(k)(8)(C), a taxpayer is entitled to a tax exclusion for "[t]he producing, delivering or rendering of a public utility service, or in constructing, reconstructing, remodeling, repairing or maintaining the facilities which are di-

---

**10.** In *Commonwealth v. Lafferty,* 426 Pa. 541, 548, 233 A.2d 256, 260 (1967), our Pennsylvania Supreme Court noted that "tax pyramiding" was "a tax on tax situation."

rectly used in the producing, delivering or rendering such service." The Tax Code does not define the term "public utility." However, this Court again finds guidance from our prior case law and the "Public Utility Code" (Public Utility Code), 66 Pa. C.S. §§ 101–1328.

In *Vincent Construction, Inc. v. Commonwealth*, 668 A.2d 289, 291 (Pa.Cmwlth. 1995) this Court determined:

The [Tax] Code excludes from the use tax property which is directly used in rendering a public utility service. 72. P.S. § 7201(*o*). The [Tax] Code does not define 'public utility service,' but this Court has held *the public utility exemption is only available to: (1) a public utility as defined under the Public Utility Code; (2) a contractor who purchases the materials for the use of a public utility in the service of providing the public utility service; and (3) an entity long established by the courts to be a public utility* .... (emphasis added).

... For a facility to be considered a public utility, the services of the facility cannot be limited to a special class of persons, but must be able to be used by the indefinite public .... Whether a facility is private or public in nature does not depend upon the number of people who use the service but whether or not

the service is available for the use of all members of the public who may request it. (footnote and citations omitted).

■ Section 102(1)(vi) of the Public Utility Code, 66 Pa.C.S. § 102(1)(vi) defines the term "public utility" to include "[a]ny person or corporation now or hereafter owning or operating in this Commonwealth equipment or facilities for ... [c]onveying or transmitting messages or communications, except as set forth in paragraph (2)(iv) by telephone or telegraph or domestic public land mobile radio service including, but not limited to, point-to-point microwave radio service for the public for compensation." Section 101(2)(iv) of the Public Utility Code provides that *"[t]he term does not include ... [a]ny person or corporation, not otherwise a public utility who or which furnishes mobile domestic cellular radio telecommunication service."* (emphasis added).[11]

■ Here, the General Assembly has determined that Taxpayer is not a public utility as defined by the Public Utility Code. And pursuant to *Vincent Construction*, Taxpayer is not a contractor that either provided material to a public utility or has previously been recognized by our appellate courts as a public utility. Further, Section 102 of the Public Utility Code specifically excludes a CTS as a public utility.[12] To extend the sales and use tax exclusion to Taxpayer simply because it is

---

**11.** Taxpayer hopes to persuade this Court to ignore the Public Utility Code's definition of a "public utility" and directs the Court's attention to the Department's regulations. The term "public utility" is defined as "[a] person engaged in the performance of public utility service, as that term is defined in this section" and the term "public utility service" as "[t]he performance of services for compensation for the general public, without discrimination, which is subject to regulation by a governmental agency rather than determined by contract with the person for whom the services are performed; provided that the services so performed shall be affected with a

public interest." 61 Pa.Code § 32.1. "Where there is a conflict between the statute and a regulation purporting to implement the provisions of that statute, the regulation must give way." *Department of Transportation, Bureau of Motor Vehicles v. Colonial Nissan, Inc.,* 691 A.2d 1005, 1009 (Pa.Cmwlth.1997), *citing Heaton v. Commonwealth Department of Public Welfare,* 96 Pa.Cmwlth. 195, 506 A.2d 1350 (1986).

**12.** Notably missing from Taxpayer's argument is that the General Assembly specifically excluded Taxpayer as a public utility. As our Pennsylvania Supreme Court noted in *Laffer-*

subject to the FCC regulation would require this Court to ignore Pennsylvania statutory authority and case law and allow any public service organization regulated by any government agency to qualify as a public utility in Pennsylvania. This Court is convinced the General Assembly was not so inclined.[13]

Accordingly, we affirm.

### ORDER

AND NOW, this 28th day of May, 2002, the order of the Pennsylvania Board and Finance and Revenue in the above-captioned matter is affirmed. The Chief Clerk shall enter judgment in this matter unless exceptions are filed within thirty days of this order pursuant to Pa.R.A.P. 1571(i).

---

*ty,* "the statutory exclusion ... was meant by the Legislature to apply only to Public Utility Code 'public utilities' " and that "the Legislature felt that the effects of such 'pyramiding' ... were not of such gravity to warrant the exclusion" to entities not qualifying as a public utility. *Id.* at 548, 233 A.2d at 259.

**13.** Taxpayer has also attempted to raise in the Argument section of its brief whether the denial of the requested exclusion violated the Uniformity Clause of the Pennsylvania Constitution because it treated CTS providers differently from electrical and conventional telephone (landline) service providers that are legislatively recognized as public utilities. Essentially, Taxpayer argues that it provides similar services to these recognized public utilities. Issues argued but not raised in the Statement of Questions Involved (Pa. R.A.P. 2116) are waived. *Greenwich Collieries v. Workmen's Compensation Appeal Board (Buck),* 664 A.2d 703, 706 (Pa.Cmwlth.1995).

Assuming arguendo that this issue was preserved, this Court finds no merit to Taxpayer's argument. Our Pennsylvania Supreme Court stated that "a classification for tax purposes is valid when it 'is based upon some legitimate distinction between the classes that provide a non-arbitrary and "reasonable and just" basis for the different treatment.' " *Leventhal v. City of Philadelphia,* 518 Pa. 233, 239, 542 A.2d 1328, 1331 (1988), *quoting Leonard v. Thornburgh,* 507 Pa. 317, 321, 489 A.2d 1349, 1350 (1985) and *Aldine Apartments v. Commonwealth,* 493 Pa. 480, 426 A.2d 1118, 1121–22 (1981).

In *Lafferty,* Lafferty Trucking Company, a contract carrier, raised a similar argument before our Pennsylvania Supreme Court that because it "performs services which can be equated with those of a genuine public utility, i.e., a common carrier, it ... is encompassed within the ambit of the exclusionary clause." *Id.* at 545–56, 233 A.2d at 258. Our Pennsylvania Supreme Court rejected this argument and emphatically stated an entity must be a public utility to qualify for "the sales and use tax public utility service exclusion." *Id.* at 547, 233 A.2d at 259. Like, the factual situation in *Lafferty,* a landline telephone service provider is a public utility and a telecommunication service provider is not. In effect, Taxpayer requests this Court to overrule *Lafferty.* This we cannot do. "The Supreme Court (a) shall be the highest Court of the Commonwealth and in this court shall be reposed the supreme judicial power of the Commonwealth ...." Article 5, Section 2 of the Pennsylvania Constitution.

In any event, there is a significant difference between electrical service providers and telecommunications service providers. The electrical service providers use fuel, water, steam or wind to operate turbine blades in electric generators. The turbine blades and the generator's magnet rotate which causes current to flow within the wire coils. The wire coils located within the generating facility are connected by wire to consumer locations. To the contrary, the telecommunication service provider captures signals, amplifies the signals and combines them with other signals for transmission by wire, fiber optics or microwave. (This is a distillation of a very complex and technical procedure that is detailed at great length in the Partial Joint Stipulations of Fact at pages 10–17 and 25–27). The decision by the General Assembly not to classify a CTS as a

public utility was based upon a legitimate

distinction.