852 A.2d 1161

AMP INCORPORATED, Appellant,

v.

COMMONWEALTH of Pennsylvania, Appellee.

Supreme Court of Pennsylvania.

Argued Dec. 2, 2003.

Decided June 22, 2004.

Craig Allen Longyear, Esq., John H. Enos, Esq., Harrisburg, for AMP Incorporated.

D. Michael Fisher, Esq., Bartholomew J. Deluca, Esq., Harrisburg, for Commonwealth of Pennsylvania.

BEFORE: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and LAMB, JJ.

## *OPINION*

Justice SAYLOR.

In this direct appeal, we consider whether the manufacturing exclusion from assessment under Pennsylvania's statutory scheme of use taxation reaches certain packaging and storage equipment and materials purchased for use by a manufacturer of component parts at an in-state distribution facility.

Pursuant to the Tax Reform Code of 1971,[1] a six-percent tax is imposed on the "use" in the Commonwealth of certain tangible personal property and services purchased during an assessment period but not subject to sales taxation. *See* 72 P.S. § 7202(b). Property used in the "manufacture" of other tangible personal property, however, is expressly excluded from the use-tax assessment. *See* 72 P.S. § 7201(*o*)(4)(B)(i). In implementing this manufacturing exclusion, the Pennsylvania General Assembly has restricted the general definition of manufacturing to activities resulting in physical changes to property, *see* 72 P.S. § 7201(c) (defining manufacturing to include "processing or other operations ... which place any tangible personal property in a form, composition or character different from that in which it is acquired"), and has mandated the "direct use" of excluded property in manufacturing operations as a prerequisite for application of the exclusion under the general definition. *See* 72 P.S. § 7201(*o*)(4)(B)(i). Under the statute, manufacturing commences with the first production stage and ends with the completion of the property having the physical qualities which it has when transferred by the manufacturer to another. *See* 72 P.S. § 7201(c)(1). Additionally, and of central relevance to this appeal, in delineating the scope of excluded manufacturing operations, the Legislature included the parenthetical proviso "including packaging, if any, passing to the ultimate consumer," so that the relevant portion of the statutory definition of manufacturing proceeds as follows:

(c) **"Manufacture."** The performance of manufacturing, fabricating, compounding, processing or other operations, engaged in as a business, which place any tangible personal property in a form, composition or character different from that in which it is acquired whether for sale or use by the manufacturer, and shall include, but not be limited to—

(1) Every operation commencing with the first production stage and ending with the completion of tangible personal property having the physical qualities (including packaging,

1. Act of March 4, 1971, P.L. 6, No. 2, art. I–XII (as amended, at 72 P.S. §§ 7101–10004 (the "Tax Code")).

if any, passing to the ultimate consumer) which it has when transferred by the manufacturer to another[.]

72 P.S. § 7201(c).

At all times relevant to the present appeal, Appellant AMP Incorporated ("AMP"), was a Pennsylvania corporation having its headquarters in Harrisburg, Pennsylvania; was principally engaged in the manufacture, marketing, sale, and distribution of solderless electrical and electronic devices and related products (such as splicers, connectors, cable and panel assemblies, networking units, sensors, switches, and fiberoptic equipment); and manufactured its products in facilities throughout Pennsylvania and Virginia. As AMP's products were designed as component parts, its primary customers were other manufacturers of electronic equipment. AMP also sold to distributors, but the company made no retail sales.

In the early 1990's, AMP constructed a Pennsylvania distribution facility (the "Distribution Center"), in Mechanicsburg, Pennsylvania, as a hub to receive product shipments from fifteen of its Pennsylvania and Virginia manufacturing facilities. The products were initially packaged at the manufacturing facilities, either individually in small boxes, self-sealing plastic bags, rigid blister packs, or, in the case of small components, multi-count bags. Products reaching the Distribution Center underwent a weighing and inspection process, then were stored on shelving or in bins until selected to fill a customer's order. The average duration of this storage was just over five weeks.

Prior to shipment to AMP's customers, the majority (approximately eighty-two percent) of the products proceeding through the Distribution Center were repackaged there, either to upgrade the packaging to render it suitable for customer shipment or to meet customer quantity specifications. Once any necessary repackaging was accomplished, the Distribution Center prepared the products for shipment, placing them in cartons, sealing them, and moving the cartons to a designated shipping area for palletizing, shrink-wrapping, and affixing of an address label. None of the bar-coded informa-

tion or other information on any labels applied at the Distribution Center provided retail or wholesale pricing information or other information typically associated with general consumer products. Equipment and materials purchased by AMP for its Distribution Center activities included, *inter alia:* shelves and racks to house the shipped products; forklifts and order pickers to move the products on and off shelves; conveyors to move the products into, between, and/or out of various departments; and packaging materials to place the manufactured products into the boxes, bags and packs.

This appeal involves a 1996 audit by the Bureau of Audits of the Department of Revenue (the "Department"), in which the Department made a total use-tax assessment of approximately $1.9 million, which included, *inter alia,* assessments in relation to AMP's equipment and material purchases for its Distribution Center operations, plus interest and penalties. The relevant portion of the assessment resulted from the application of the Department's regulations pertaining to the "direct use" criterion of the manufacturing exclusion. Those regulations specify as follows:

(1) *Direct use.* In determining whether property is directly used, consideration shall be given to the following factors:

(i) The physical proximity of the property in question to the production process in which it is used.

(ii) The proximity of the time of use of the property in question to the time of use of other property used before and after it in the production process.

(iii) The active causal relationship between the use of the property in question and the production of a product. The fact that particular property may be considered essential to the conduct of the business of manufacturing or processing because its use is required either by law or practical necessity does not of itself, mean that the property is used directly in the manufacturing or processing operations.

61 Pa.Code § 32.32(a)(1). Additionally, the regulations expressly distinguish "post production activities" from manufacturing operations, with the former being defined as follows:

Property used to transport or convey the finished product from the final manufacturing or processing operation, which includes but does not extend beyond the operation of packaging for the ultimate consumer, and storage facilities or devices used to store the product, are not used directly in manufacturing or processing and are taxable. For example, equipment which loads packaged products into cases or cartons for ease of handling in delivery shall be subject to tax. Machinery, equipment, supplies and other property used to convey, transport, handle or store the packaged product shall also be taxable.

61 Pa.Code § 32.32(a)(3)(iii)(I).

AMP was successful in obtaining partial relief with respect to the overall assessment before the Department's Board of Appeals and in the Board of Finance and Revenue; however, both tribunals rejected its contention that the manufacturing exclusion applied to equipment and materials used at the Distribution Center.

On appeal to the Commonwealth Court, the parties stipulated that the disputed amount of the use-tax assessment pertaining to the Distribution Center equipment and materials was $263,299. In addition, AMP was permitted to supplement the record with a document entitled, "Analysis of House Bill 337 (Printers' No. 160) Session of 1957," which was prepared by the then-Pennsylvania Department of Justice. The Analysis pertained to the amendment adding the scope-of-manufacturing language to the definition of manufacturing (including the "packaging, if any, passing to the ultimate consumer" phraseology) and concluded that the effect of the amendment "would be to exempt [from use taxation] all equipment used for packaging, wrapping, filling, and the material handling equipment incidental to such operations." Analysis of House Bill 337 at 11. Further, AMP advanced its position that equipment and materials at the Distribution Center were used predominantly and directly in operations occurring after the first production stage, which ends with the wrapping of its manufactured products for shipment to other manufacturers, and therefore, the equipment at issue qualified for exclusion

from use taxation. In addition, AMP asserted that a manufacturer making use of component parts was itself an "ultimate consumer" of those parts, since AMP components were "consumed" in the subsequent operations of its customer manufacturers. Thus, according to AMP, the exclusion applied to purchases of equipment used predominantly in the packaging of manufactured property sold to other manufacturers.

The Commonwealth Court, however, rejected these arguments and affirmed the order of the Board of Finance and Revenue in a published opinion. *See AMP Inc. v. Commonwealth*, 814 A.2d 782 (Pa.Cmwlth.2002). Applying the statutory requirement of physical change to constitute manufacturing, the court concluded that manufacturing simply did not occur at the Distribution Center; rather, manufactured products were stored, wrapped, and shipped to fill customer orders. *See id.* at 785. In terms of the "direct use" in manufacturing requirement of the exclusion, the Commonwealth Court agreed with the Department that Distribution Center activities most closely resembled post-production activities, as defined in Department regulations. *See id.* at 785–86 (citing 61 Pa.Code § 32.32(a)(3)(iii)(I)). The Commonwealth Court also considered each prong of the Department's direct-use test (geographic proximity, proximity in time, and causal relationship, *see* 61 Pa.Code § 32.32(a)(1)), highlighting the Distribution Center's geographic dislocation from primary manufacturing facilities; the average of over five weeks of storage between physical manufacturing and re-packaging at the Distribution Center; and the causal disconnect between Distribution Center storage and packaging activities and core manufacturing operations. *See id.* at 786–87.

Finally, the court considered AMP's argument that its operations qualify for the exemption under the clause pertaining to "packaging, if any, passing to the ultimate consumer." The Commonwealth Court, however, determined that the phrase "ultimate consumer" does not encompass manufacturers making use of component products, but rather, refers to retail customers. *See AMP Inc.*, 814 A.2d at 787. In this regard, the court distinguished its prior decision in *M &*

*M/Mars, Inc. v. Commonwealth,* 162 Pa.Cmwlth. 375, 639 A.2d 848 (1994), *aff'd per curiam,* 540 Pa. 635, 658 A.2d 797 (1995), which held that the use of machinery employed to package candy bars in cartons that were then sold to grocery stores, food warehouses, and food distributors was excluded from use-tax assessment, although in some cases entities other than the ultimate purchaser purchased some of the cartons carrying the candy bars. The court noted that, central to *Mars'* reasoning, some of the candy cartons passed to the ultimate consumer, the cartons contained consumer information, and the cartons were obviously designed and produced for the consumer. The court also distinguished *Mars* on the basis that, there, the taxpayer wrapped the candy bars immediately after the manufacturing process, whereas, in the present matter, the packaging occurred at a time and place substantially remote from the manufacturing process. *See AMP Inc.,* 814 A.2d at 787 (*discussing Mars,* 162 Pa.Cmwlth. at 384–85, 639 A.2d at 852).[2]

The Commonwealth Court denied AMP's exceptions, *see AMP Inc. v. Commonwealth,* 815 A.2d 1141, 1143 (Pa.Cmwlth. 2002), and AMP's present direct appeal to this Court followed. *See* 42 Pa.C.S. § 723(b).

As noted, in Pennsylvania, the central, statutory conception of the manufacturing exclusion embodies a fairly restrictive definition of manufacturing centered on physical change and the requirement of direct use in manufacturing. *See* 72 P.S. § 7201(c), (*o*)(4)(B)(i). This stands in contrast to the prevailing approach of many other jurisdictions, which have come to employ a broader conception, known as the integrated plant unit concept, as the touchstone for manufacturing-based relief from sales and use taxation. *See generally* JEROME R. HEL-LERSTEIN & WALTER HELLERSTEIN, STATE TAXATION ¶ 14.05[2][d], 1999 WL 1398985, *7–12 (3d ed.2004).[3] The latter approach

---

**2.** Apparently in light of the force of its plain-meaning analysis, the Commonwealth Court declined to address the weight, sufficiency, and materiality of the Department of Justice analysis of the Tax Code amendments, which it had admitted into evidence. *See id.* at 788 n. 3.

**3.** The integrated plant approach to defining manufacturing is distinguishable from the Department's "integrated plants" regulation, which

focuses more greatly on the economic relationship of the manufacturer's purchase of equipment and material to the end product, as opposed to the physical relationship. *See id.* at ¶ 14.05[2][d][i], 1999 WL 1398985, *10–11. This has the advantages of harmonizing the application of the exclusion more closely with its primary theoretical justification, namely, the avoidance of tax pyramiding, and permitting regulators and reviewing courts to focus on economic realities as opposed to the mechanics of each individual manufacturing process. *See id.* It has the corresponding disadvantage, however, of diminishing the available tax base, thus implicating a decision on the part of the policy maker (the legislature) whether and to what extent to raise revenues via a tax on "business consumption." *See id.*

■ Whatever the merits of the respective approaches from a standpoint of tax policy, the Pennsylvania General Assembly's decision to implement the relatively narrower approach channels our review in the present matter. In this regard, for the reasons that the Commonwealth Court has identified, we agree that it correctly held that the post-production packaging and distribution activities conducted at the Distribution Center do not qualify as manufacturing operations under the Pennsylvania statutory scheme. Indeed, it is questionable whether such activities would even qualify as manufacturing under an integrated plant unit approach, particularly where the statutory exemption framework maintains the requirement of a direct-use nexus. *See generally* HELLERSTEIN, STATE TAXATION ¶ 14.05[2][d][i], 1999 WL 1398985, *11 (criticizing a state court decision characterizing the weighing and sacking of charcoal briquettes as a direct part of the manufacturing

does not change the character of the definition of manufacturing, but rather, merely recognizes that the process of manufacturing (entailing the physical changing of property) can occur in stages at multiple locations. *See* 61 Pa.Code § 41.5(a) ("Whenever a person is engaged in a recognized integrated business composed of a series of operations which either collectively constitute manufacturing, or individually constitute one or more of the operations specified as manufacturing in section 201(c)(2), (3), (4) or (5) ... production is not deemed to end finally until the completion of the product in the last operation of the production series.").

process as "far-fetched," and stating that "[b]y the time the weighing and packing process begins, manufacturing has ended; [w]eighing and packaging are part of marketing and distribution of the goods.").

■ We acknowledge that a nuance in Pennsylvania law arises out of the statutory proviso including within the scope of manufacturing operations: "packaging, if any, passing to the ultimate consumer." 72 P.S. § 7201(c)(1). In the very abstract, AMP's argument that its customer base of other manufacturers and distributors constitute "consumers" of its products has some arguable merit. But read in the context of Pennsylvania's more constrained approach to manufacturing in the first instance, and in light of the General Assembly's use of the adjective "ultimate" as a further limitation, we agree with the Commonwealth Court and the Department that what is intended to be excluded are the sorts of wrapping and packaging operations more closely connected to the actual manufacturing process and typically associated with consumer products, such as those at issue in *Mars* (candy wrappers and multi-bar boxes marked with consumer information), as opposed to the sorts of substantially remote, post-production, storage and distribution activities that occurred at AMP's Distribution Center.[4] We are also in accord with the Com-

---

4. When statutory words or phrases at issue are undefined by the statute, the Court construes the words according to their plain meaning and common usage. *See* 1 Pa.C.S. § 1903(a); *DeLellis v. Borough of Verona*, 541 Pa. 3, 10, 660 A.2d 25, 28 (1995). In this regard, in accordance with its plain meaning, "ultimate" refers to a point "beyond which it is impossible to go; farthest; most remote or distant" or "by which a process or series comes to an end; final; conclusive." WEBSTER'S NEW WORLD COLLEGE DICTIONARY 1551 (4th ed.1999). "Consumer" is "[a] person who buys goods or services for personal, family, or household use, with no intention of resale; a natural person who uses products for personal rather than business purposes." BLACK'S LAW DICTIONARY 311 (7th ed.1999); *see also* WEBSTER'S NEW WORLD COLLEGE DICTIONARY 313 (4th ed.1999) (a "consumer" is "a person or thing that consumes; specif., a person who buys goods or services for personal needs and not for resale or *to use in the production of other goods for resale*")(emphasis added); *cf. Paper Prods. Co. v. City of Pittsburgh*, 183 Pa.Super. 234, 246, 130 A.2d 219, 224 (1957) (" The essential distinction between a wholesaler and a retailer is that the person buying from a retailer is the ultimate user or consumer of the article or commodity and does not sell it again, whereas the one buying from a

monwealth Court's rejection of AMP's argument that the General Assembly meant to encompass packaging "including but not limited to" that which passes to the ultimate consumer, when it did not so specify.[5]

■ Bearing in mind the deference ordinarily due to the Department's regulations, *see Borough of Pottstown v. Pennsylvania Mun. Ret. Bd.*, 551 Pa. 605, 611, 712 A.2d 741, 744 (1998), but also affording due perspective to the principle that exclusions are to be construed strictly against the Commonwealth and in favor of the taxpayer where there is reasonable doubt as to the legislative intent, *see BFC Hardwoods, Inc. v. Board of Assessment Appeals, Crawford County*, 565 Pa. 65, 72 n. 5, 771 A.2d 759, 763 n. 5 (2001), we hold that the Department did not err in its assessment of the relevant equipment and materials purchased for use in Distribution Center activities.

The order of the Commonwealth Court is affirmed.

Former Justice Lamb did not participate in the decision of this case.

Justice NIGRO files a dissenting opinion.

wholesaler buys only for the purpose of selling the article again.' ") (quoting *Haynie v. Hogue Lumber & Supply Co. of Gulfport*, 96 F.Supp. 214, 216 (D.C.Miss.1951)), *aff'd*, 391 Pa. 87, 94, 137 A.2d 253, 257 (1958).

5. We also note that the Department of Justice's 1957 analysis, in context, proceeds as follows:

> The present regulations of the Department, which are based upon a detailed analysis of the present statute and general law, exempts all production and materials handling equipment up to the point at which the product reaches the state in which it is placed in a package or a container. The effect of the proposed amendment would be to exempt all equipment used for packaging, wrapping, filling, and the material handling equipment incidental to such operations.

Analysis of House Bill 337 at 10–11. We do not read this analysis as an endorsement for manufacturing-exclusion application to all instances of post-production packaging, no matter how remote from the core manufacturing process. Moreover, we agree with the Commonwealth Court that the Department of Justice's analysis is collateral to the central inquiry concerning legislative intent as discerned from the terms of the statute.

Justice NIGRO, dissenting.

I respectfully dissent as I believe that the packaging equipment at issue in this case falls within the General Assembly's definition of "manufacture" as "packaging ... passing to the ultimate consumer," 72 P.S. § 7201(c), and that AMP's utilization of that equipment in its operations constituted a "direct use" pursuant to 72 P.S. § 7201(o)(4)(B)(i).

Unlike the majority, I simply cannot accept an interpretation of the manufacturing exclusion that excludes from taxation equipment used by an assembler of component parts to package its completed product for sale to a retail consumer, while simultaneously permitting the taxation of packaging equipment utilized by the manufacturer of one of the retail product's component parts to prepare its completed product for delivery to its ultimate consumer, i.e., the assembler. Moreover, I disagree with the Commonwealth Court's conclusion that the small geographical distance and time delay between AMP's assembly of its products and its packaging of those products at the Distribution Center was sufficient to remove the equipment used in the packaging process from the scope of "direct use" as set forth in 72 P.S. § 7201(o)(4)(B)(i) and interpreted in 61 Pa.Code § 32.32(a)(i).